**In re Jerome D. BAKER, Debtor.**

**Bankruptcy No. 94 B 11361.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 26, 1996.

John Giierum, Trustee, DiMonte, Schostok & Lizak, Park Ridge, Illinois.

David K. Welch, Dannen, Crane, Heyman & Simon, Chicago, Illinois, for Jerome D. Baker.

Robert I. Boehm, Boehm, Pearlstein & Bright, Ltd., Chicago, Illinois, for LaSalle Nat. Bank, NI.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Chief Judge.

This matter is before the court on the Objection to Debtor's Claim of Exemption of LaSalle National Bank Northbrook

("Bank").[1] Jerome D. Baker ("Debtor") claimed as exempt his interest in the Bakco Data, Inc. Profit Sharing Plan and Trust pursuant to § 522(b) of the Bankruptcy Code.[2] The Debtor argues that this interest is not property of his bankruptcy estate because it is his share of an ERISA-qualified plan and, as such, is excluded from the estate pursuant to § 541(c)(2). In the alternative, the Debtor argues that even if his interest under the Plan and Trust is not excluded from his bankruptcy estate under § 541(c)(2), it is exempt under § 522(b) and, specifically, 735 ILCS 5/12–1006 of the Illinois Statutes.

A hearing was held on November 14 and 15, 1995. At that time the court ordered the parties to submit briefs on two issues: (1) the definition of "ERISA-qualified" and (2) what actions destroy ERISA-qualification. Oral argument on these issues was heard on March 7, 1996. Having read the briefs and heard the arguments of both parties, and having reviewed the testimony and examined the exhibits presented to the court at the hearing, the Bank's objection is overruled. The court finds as a matter of fact and law that the Bakco Data, Inc. Profit Sharing Plan and Trust was and remains an ERISA-qualified plan and the Debtor's interest therein is excluded from the estate pursuant to § 541(c)(2). Because the Debtor's interest is excluded from the estate, the court need not reach the issue of whether the Debtor's interest is exempt under § 522(b).

### Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) as a matter arising under the Bankruptcy Code. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and is before the court pursuant to Local Rule 2.33 of the United States District Court for the Northern District of Illinois, which refers bankruptcy cases and proceedings to this court for hearing and

determination. Venue is proper pursuant to 28 U.S.C. § 1409(a).

The Bank, as the objecting party, has the burden of proof. Fed.R.Bankr.P. 4003(c); *see also In re Ritter*, 190 B.R. 323, 326 (Bankr.N.D.Ill.1995); *In re Hanes*, 162 B.R. 733, 740 (Bankr.E.D.Va.1994). The standard of proof is a preponderance of the evidence. *Ritter*, 190 B.R. at 326.

### Background

On October 1, 1983, Bakco Data Inc. ("Bakco"), an Illinois corporation, established the Bakco Data, Inc. Profit Sharing Plan and Trust. Bank's Exhibit 1, § 1.1. On January 1, 1992, Bakco amended and restated its original profit sharing plan (hereinafter "Plan") to meet the requirements of § 401(a) of the IRC.[3] Bank's Exhibit 3, Preamble.

On September 29, 1992, under a second document ("Trust Document") drafted in accordance with the Plan, the Bakco Data, Inc. Profit Sharing Trust ("Trust") was established. Bank's exhibit 3, Preamble. The Trust was created to implement and form a part of the Plan. Bank's Exhibit 3, Preamble. Bakco amended the Plan and Trust to ensure that contributions Bakco made under the Plan would be tax deductible and that income earned by the Trust would be exempt from income tax. *See id.;* 26 U.S.C. § 501(a). At the hearing it was established that the 1992 amendments to both the Plan and the Trust did, in fact, meet the requirements of ERISA[4] and the IRC.

In order to comply with ERISA, the Plan sets various limitations on who may participate and the amount of the contributions Bakco may make on behalf of any participant. Bank's Exhibit 1, §§ 2, 4. The Plan includes a loan provision that is consistent with the requirements of ERISA. *See id.* at § 7.12; 29 U.S.C. § 1108(b)(1). The Plan provides that the trustees of the Trust, in

---

1. The Bank, originally known as LaSalle National Bank Northbrook, is now known as LaSalle National Bank NI.

2. 11 U.S.C. § 101 *et seq.* All section references are to the Bankruptcy Code unless otherwise noted.

3. Internal Revenue Code of 1986, 26 U.S.C. §§ 1–9722. Section 401(a) defines pension, profit-sharing, and stock bonus plans that qualify for tax exempt status under the IRC.

4. Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1000–1461.

their sole discretion, may make loans to a participant for any purpose that the trustees believe to be desirable and in the best interest of such participant. *Id.* The loan provision also includes certain restrictions: loans must be requested in writing, participants may only borrow against the nonforfeitable (vested) balances of their accounts, participants may only take one loan at a time, and married participants must have their spouses' consent before taking loans. *Id.* The Plan requires borrowing participants to pledge the vested balance of their accounts to secure repayment of the loan, and requires that the loans be evidenced by notes approved by the trustees. *Id.* The loan must bear an interest rate equal to the prevailing rate for similar loans from a Chicago institution. *Id.* The Plan also requires that each loan be repaid within five years in periodic payments, not less frequently than quarterly.[5] *Id.*

The Plan provides that non-payment under a loan constitutes a loan default. Bank's Exhibit 1, § 7.12. The Plan specifically sets out procedures to be followed if a participant defaults on a loan. *Id.* The Plan states that if a participant is in default on the participant's "termination date," defined as the date on which the participant is entitled to receive payments, the amount of the loan must be charged against the participant's account in an amount equal to the total loan, including accrued interest and other costs, before any payment or distribution may be made to the participant. *Id.*

Among the employees participating in the Plan were the Debtor and several of his children, including: Laurel Goldman (previously known as Laurel Snyder) ("Goldman"), Susan Drucker ("Drucker"), and Steven Baker ("Steven"). It was established at the hearing that there were as many as eighteen participants in the Plan.

From the Plan's inception, the Debtor was one of the trustees of the Trust. Until 1992, Goldman was the co-trustee; from 1992 until the present, Steven has been the co-trustee.[6] The evidence elicited at the hearing indicated that neither Steven nor Goldman were actively involved in the management of the Trust, and would merely "rubber stamp" the actions of the Debtor as trustee. In fact, many transactions took place without either of the co-trustees' knowledge or input.

The Debtor and several of his children borrowed from the Trust. These loans were made without strict compliance with the loan provisions of the Plan. Specifically, none of these loans were requested in writing; both the Debtor and his daughter, Goldman, received more than one loan; the loan recipients did not specifically pledge, in writing, the vested balance of their accounts as security for the loan; and, in most cases, the spouses were not consulted before the loans were made. However, all the loans were charged against the vested balances of the borrowing participants. Some of these loan proceeds were either contributed or loaned to Bakco for working capital. For example, the Trust issued a check for $20,000.00 to Bakco in November 1992. The Debtor testified that the check represented a portion of a $25,000.00 loan taken by Goldman and charged against her vested balance in the Trust.[7] On December 2, 1992, the Debtor

---

5. The Bank argues that borrowing participants *must* authorize Bakco to make payments on loans by payroll deductions. This is a misunderstanding of the terms of the Plan. The Plan allows payments on loans by payroll deductions if participants *choose* to repay the loan in that fashion. The clause protects participants by preventing Bakco from automatically deducting loan payments from participants' paychecks without authorization. If participants were required to repay loans by payroll deductions, the time period between payments on loan, by definition, would be the pay period. This would render meaningless the language requiring payments to be made no less than quarterly.

6. In addition to being Plan participants and trustees, several members of the Debtor's family are stockholders and hold positions as Directors and Officers of Bakco. The Debtor testified at the hearing that he is the majority shareholder of Bakco and has held no less than 50.9% of the outstanding shares at all times relevant to this Opinion. Other members of the Debtor's family are also shareholders. The Debtor is the President of Bakco. Steven is the Executive Vice President of Bakco and Goldman is the Secretary–Treasurer. The Debtor, Steven, and Goldman are all members of the Board of Directors.

7. At the hearing there was some dispute over whether this $25,000.00 loan was, in fact, origi-

took out a loan for $30,000 from the Trust. The check was issued to the Debtor, but the Debtor testified that he loaned the funds to Bakco. Then, on December 30, 1992, the Trust issued another check for $20,000.00 to Bakco. The Debtor testified that this was a second loan charged against his vested balance. He also testified that this was another personal loan he made to Bakco. In late January or early February 1994, Steven borrowed $16,000.00 against his vested balance. The funds were used to reimburse his spouse for a loan she had made to pay Bakco's federal payroll taxes.

The trust made other loans to Goldman and Drucker, again borrowed against their respective vested balances. The proceeds of these loans, however were not in turn loaned to Bakco. No other Plan participants requested or received loans from the Trust. With the exception of one interest payment, not one of the questioned loans were repaid to the Trust. Bakco did not repay the funds that the Debtor, Goldman, or Steven loaned to Bakco, if in fact that is what these contributions were. There were no allegations that Bakco improperly channeled funds from the Trust directly into its coffers.

In early February 1994, the Bank attached all the assets of Bakco. By March 1, 1994, Bakco ceased to operate. At that time there were approximately fourteen participants in the Plan. The Trust was audited, and the auditors determined what amount should be distributed to each participant. In April 1994, the Debtor, in his capacity as trustee, sent letters to the participants informing them that the funds in the Trust would be disbursed, either directly into an IRA of the employees' choice, or paid to the employees for them to roll over into an IRA or keep as they saw fit. By September 1994, the Debtor, in his capacity as trustee, had made distributions to all participants other than his children and himself. The funds due the

Debtor's children were similarly distributed in late 1994 and 1995.[8]

The Debtor's voluntary petition under Chapter 7 of the Bankruptcy Code was filed on June 6, 1994. The Debtor listed the Bank as a creditor. The Debtor also listed as an asset his entire interest (his vested balance) in the Trust, which has a present value of $250,000.00. By the time of the hearing, only the Debtor's interest remained in the Trust.

## Discussion

### I. ERISA-qualified plans are excluded from the estate under § 541(c)(2).

Section 541(a)(1) broadly defines what interests comprise property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(c)(2), however, excludes from the estate certain interests of the Debtor. Specifically, § 541(c)(2) provides that:

> A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under [the Bankruptcy Code].

The Supreme Court has determined that the phrase "applicable non-bankruptcy law" includes both state and federal law. *Patterson v. Shumate*, 504 U.S. 753, 759, 112 S.Ct. 2242, 2247, 119 L.Ed.2d 519 (1992). More specifically, the Supreme Court in *Patterson* determined that an "ERISA-qualified trust" was excluded from property of the estate under § 541(c)(2). *Id.*

After *Patterson*, it is no longer necessary to determine whether an ERISA-qualified plan is a spendthrift trust and thus excluded or exempt from the estate under state law. *See Shumate v. Patterson*, 943 F.2d 362, 364 (4th Cir.1991), *aff'd*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Nor is it necessary to determine whether an

---

nally taken by Goldman. The Debtor testified that originally this loan was to be charged against his vested balance, but that his accountant advised that once interest accrued, the Debtor would exceed the allowed limit on loans. Thus, Goldman agreed to take the $25,000.00 loan and have it charged against her vested balance.

8. The Debtor expressed at the hearing that it was his intent to terminate the Plan and disburse all funds in the Trust by the end of 1994, but that he was unable to do so because of the Bank's objections.

ERISA-qualified plan is a self settled trust and thus not excluded or exempt pursuant to state law. *See Barkley v. Conner (In re Conner),* 73 F.3d 258, 260 (9th Cir.1996) ("the Supreme Court appears to have discounted any distinctions based on the debtors' control of their assets."); *Shumate,* 943 F.2d at 364; *In re Holst,* 192 B.R. 194, 199 (Bankr. N.D.Iowa 1996) ("The legal issue is not whether [the debtor] had the right to demand and obtain the funds as a beneficiary, but whether until [the debtor] had obtained them, ERISA's restriction on transfer continued to apply."). Once the plan is determined to be ERISA-qualified, the inquiry is finished. *Shumate,* 943 F.2d at 364 ("ERISA requires a plan to have [an anti-alienation] provision.... No more inquiry need be made to determine whether the trust is controlled by the settlor or the beneficiary, or whether they are the same person."); *see also Arkison v. UPS Thrift Plan (In re Rueter),* 11 F.3d 850, 852 (9th Cir.1993) ("Under [*Patterson*], a court need look no further than whether the ERISA-qualified plan at issue has an anti-alienation provision that satisfies the literal terms of § 541(c)(2)."). Thus, the only inquiry is whether the Plan, and the Trust created within that Plan, were ERISA-qualified.

This result at first may seem counterintuitive in the bankruptcy context, because funds to which a debtor may have some limited access are now excluded from the estate. Under traditional common law trust principles and bankruptcy law, this would not be the case. However, the fact that these funds are excluded from the estate reflects a reconciliation between the congressional intent to protect retirement funds, the congressional desire for consistency in the treatment of assets both within and outside the bankruptcy context, and the broad concept of property of the estate. *See, e.g., Patterson,* 504 U.S. at 764, 112 S.Ct. at 2249 ("our decision today ensures that the treatment of pension benefits will not vary based on the beneficiary's bankruptcy status."); *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Uniform treatment of property interests ... prevent[s] a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' [citation

omitted]"); *Anderson v. Raine (In re Moore),* 907 F.2d 1476, 1480 (4th Cir.1990) ("We see no evidence that Congress intended to invite a creditor to push a debtor into involuntary bankruptcy in order to reach his ERISA funds."); *see also Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 376, 110 S.Ct. 680, 687, 107 L.Ed.2d 782 (1990) (holding that ERISA represents the congressional choice to "safeguard a stream of income for pensioners ... even if that decision prevents others from securing relief for the wrongs done them.").

The fact that *Patterson* effectively overruled those cases that analyzed ERISA under traditional common law trust principles is further illustrated by the recent Supreme Court decision, *Varity Corp. v. Howe,* ──── U.S. ────, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Although *Varity* dealt with the extent of a party's fiduciary duty to the participants in an ERISA plan, the Supreme Court's discussion of the relationship between ERISA and common law trust doctrines is particularly relevant here.

In *Varity,* the Supreme Court stated that "ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection." ──── U.S. at ────, 116 S.Ct. at 1070 (citing ERISA § 2(a)). The Supreme Court expressed its belief that:

> the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties. In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements. And, in doing so, courts may have to take account of competing congressional purposes....

*Id.* Thus, although it is counterintuitive for a bankruptcy court to allow the exclusion of assets to which a debtor has access, albeit restricted, it is required under *Patterson* if the plan in question is ERISA-qualified.

## II. The Plan is ERISA-qualified.

■ The only issue, therefore, is whether the Plan is, in law and in fact, an ERISA-qualified plan. The Supreme Court in *Patterson* did not define the term "ERISA-qualified." This term is not used in other areas of the law, and several courts have struggled with the definition of ERISA-qualified plans. *E.g., In re Bennett,* 185 B.R. 4 (Bankr. E.D.N.Y.1995); *In re Hanes,* 162 B.R. 733 (Bankr.E.D.Va.1994); *In re Hall,* 151 B.R. 412 (Bankr.W.D.Mich.1993); *In re Sirois,* 144 B.R. 12 (Bankr.D.Mass.1992). The Seventh Circuit has not yet determined the definition of ERISA-qualified.

Courts subsequent to *Patterson* use either a two step inquiry or a three step inquiry to determine whether a plan is subject to ERISA. Under the two step inquiry, courts need only determine whether a plan is "subject to" ERISA and whether that plan includes an anti-alienation clause that is enforceable under ERISA.[9] *Bennett,* 185 B.R. at 6; *Hanes,* 162 B.R. at 740. Under the three step inquiry, a court must also determine whether the plan qualifies for tax exempt status under the IRC. *Hall,* 151 B.R. at 419; *Sirois,* 144 B.R. at 14. It is unnecessary for us to determine whether the two step or three step analysis is appropriate, however, because the Plan qualifies under either test.

### A. The Plan is "subject to" ERISA.

■ To determine whether a plan has been established within the meaning of ERISA, a court must determine "whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. [citations omitted]" *Diak v. Dwyer, Costello & Knox, P.C.,* 33 F.3d 809, 812 (7th Cir.1994). "The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person

[citations omitted]." *Kennedy v. Allied Mutual Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991).

■ Both parties agree that the plan, as drafted, was subject to ERISA. Although the Bank stated at the hearing that it does not concede this point, the Bank did not present any evidence to contradict the assertion that the plan, as drafted, was subject to ERISA. Thus, even if it does not concede this point, the Bank, as objecting party, has failed to meet its burden of proof of showing that the plan, as drafted, was not subject to ERISA. *See* Fed.R.Bankr.P. 4003(c); *Ritter,* 190 B.R. at 326.

The only issue at the hearing was whether the Debtor's actions with respect to the Trust corpus rose to such a level that the Plan itself became no longer ERISA-qualified. The Bank argues that because the loans granted to the Debtor's children and the Debtor himself were not made within the terms of the Plan, the Plan was no longer subject to ERISA. However, at best, the fact that these transactions did not comply with the terms of the Plan would result in a finding that the transactions were "prohibited transactions." *See* 29 U.S.C. § 1106.

29 U.S.C. § 1106 defines certain transactions as prohibited transactions. Usually, however, loans to participants are not considered to be prohibited transactions. *See* 29 U.S.C. § 1108. If a loan is a prohibited transaction, the participant would either (a) suffer tax consequences under 26 U.S.C. § 4975, or (b) have a cause of action against the fund's trustee for breach of his fiduciary duty under 26 U.S.C. § 1109.

In this case, each of the loans not repaid were taken as income by the participant-borrower, and, so far as the court knows, all taxes and penalties on those loans were duly paid. Thus, even if these loans were prohibited transactions, any consequences flowing from such actions have already been paid. There has been no case brought to this court's attention holding that when a fiducia-

---

9. Courts using this approach usually consider this a three step inquiry, in that the court must determine (1) whether the plan is "subject to" ERISA, and (2) whether the plan includes an anti-alienation clause that is (3) enforceable un-

der ERISA. *See Bennett,* 185 B.R. at 6; *Hanes,* 162 B.R. at 740. However, this court believes that steps two and three really constitute a single analysis and, therefore, combines them.

ry engages in inappropriate and, perhaps, prohibited transactions that the entire plan is then no longer subject to ERISA. Thus, even if the loans were "prohibited transactions" under 29 U.S.C. § 1106, this would not compel a finding that the plan is no longer an ERISA-qualified plan.[10]

### B. The Plan includes an enforceable anti-alienation provision.

■ To be ERISA-qualified, a plan must also include an enforceable anti-alienation provision. *See Moore,* 907 F.2d at 1479. Specifically, ERISA requires that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). This is because the "overriding purpose of ERISA is to guarantee the security of employees' retirement income." *Moore,* 907 F.2d at 1479. ERISA effectuates this policy by restricting the assignment and alienation of these benefits. *Id.* at 1480 ("ERISA's non-alienability provisions prevent both voluntary and involuntary encroachments on vested benefits.").

The Trust included an enforceable anti-alienation provision. Article III–3 of the Trust Document states as follows:

> The interests under this Trust Agreement of Participants and other persons entitled to benefits under the Plan are not subject to the claims of their creditors and may not be voluntarily or involuntarily assigned, alienated or encumbered except under a qualified domestic relations order under Section 414(p) of the [Internal Revenue] Code.

Bank's Exhibit 3 at 7. Thus, under the terms of the Trust, the benefits of the pension plan could not be assigned or alienated. The Trust, therefore, contains an anti-alienation provision such that it is ERISA-qualified under the two-step inquiry. *See Bennett,* 185 B.R. at 6; *Hanes,* 162 B.R. at 740.

### C. The Plan qualifies for tax exempt status under the IRC.

As already noted above, some courts have also required a plan to be qualified for tax

exempt status to be ERISA-qualified. *See Hall,* 151 B.R. at 419; *Sirois,* 144 B.R. at 14. A plan that is subject to ERISA will also be exempt from federal taxation if it cannot be assigned or alienated:

> A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated.

26 U.S.C. § 401(a)(13). Likewise, the Treasury Regulations state that:

> a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process.

Treas. Reg. § 1.401(a)–13(b)(1).

The Plan, as already noted above, includes a valid anti-alienation provision. Furthermore, it was established at the hearing that the IRS has never found that the Plan failed to qualify for tax exempt status. Nor was any evidence presented that Bakco had to pay taxes on its contributions because of the plan's failure to meet tax exempt status. Thus, the Plan qualifies for tax exempt status under the IRC.

### III. The Bank's arguments that the Trust is, in fact, not ERISA-qualified likewise fail.

### A. Funds did not "inure to the benefit" of Bakco in violation of ERISA.

■ In addition to arguing that the loan transactions were prohibited, the Bank asserts that because funds received from some of the loan transactions were turned over to Bakco they "inured to the benefit of" Bakco. The Bank argues that because ERISA strictly prohibits any of the funds in the trust to "inure to the benefit of" the employer, the loan transactions violate ERISA in such a

---

10. In addition, the Bank has no standing to challenge these loans under the civil enforcement provisions of ERISA. *See* 26 U.S.C. § 1132 (providing that civil actions under ERISA may be

brought only by participant, beneficiary, fiduciary, or Secretary of Labor); *Varity,* —— U.S. at ——, 116 S.Ct. at 1075–79.

way as to destroy the Plan's ERISA-qualified status.

 ERISA provides that plan funds shall never "inure to the benefit of the employer." 29 U.S.C. § 1103(c). This provision must be given liberal construction to protect the financial integrity of employee pension plans and exceptions should be interpreted narrowly. *Soft Drink Industry Local Union No. 744 Pension Fund v. Coca–Cola Bottling Co.*, 679 F.Supp. 743, 747 (N.D.Ill.1988).

The Bank overlooks the fact, however, that the financial integrity of both the Plan and the Trust was never violated—the Debtor and his children took loans only against their own vested balances. No other participants were affected in any way by these loans. When the loans were taken, the vested balances of those participants did not accrue interest on the money taken as loans from the Trust. Likewise, the fact that no interest was, in fact, paid on these loans is of no consequence. Only the participants who took the loans are the parties that were adversely affected when no interest was paid because any interest paid would have accrued solely to their own vested balances. None of the other participants or beneficiaries lost benefits by reason of these loans and there were no allegations, much less proof, that Bakco raided the Trust for its own benefit or in any other manner dealt with the corpus of the Trust.

The only parties detrimentally affected were the parties that desired and took the loans. These parties were only detrimentally affected because Bakco failed to pay them back. It is not for the courts to decide whether an individual's choice of investments is prudent or desirable. Courts should not dictate what a party may or may not do with their own funds once withdrawn from an ERISA account, except to the extent that a court may be called upon to enforce any tax consequences or penalties that arise from the transaction. Thus, the fact that the participants in turn loaned or gave the funds to Bakco does not mean that funds in the Trust "inured to the benefit of Bakco" within the meaning of 29 U.S.C. § 1103(c).

**B. The Debtor's vested balance in the Trust was not, in fact, a "private investment fund."**

 The Bank alternatively argues that because the Debtor had de facto control over his vested balance as of March 1994, four months prior to the time that the Debtor filed bankruptcy, his interest in the Trust was not a retirement account at all, and instead constituted his own private investment fund. This argument also fails because once it has been determined that a plan is ERISA-qualified, the inquiry ends, and it is inappropriate for the courts to examine the extent to which the Debtor controlled the assets within the Plan. *See Conner*, 73 F.3d at 260; *Rueter*, 11 F.3d at 852; *Holst*, 192 B.R. at 199.

**C. There are no general equitable exceptions to ERISA's prohibition on assignment and alienation.**

 The Bank further argues that it is inequitable to allow debtors to retain control over assets, and still prevent their creditors from reaching those assets. This argument fails for the reasons set forth in Section I of this Opinion, as well as those set forth in *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). In *Guidry*, the Supreme Court refused to find a constructive trust in ERISA benefits because retirement benefits are inalienable absent a statutory exception, which the court found had not been met. *Id* at 373, 110 S.Ct. at 685–86. The Supreme Court specifically stated that it was inappropriate to approve a general equitable exception to ERISA's prohibition on assignment or alienation. *Id.* at 376, 110 S.Ct. at 687. This is because, as already noted above, the anti-alienation provisions in ERISA reflect a congressional choice to "safeguard a stream of income for pensioners … even if that decision prevents others from securing relief for the wrongs done them." *Id.* at 376, 110 S.Ct. at 687.

Here, the Bank does not allege the Debtor has in any way violated the statutory mandate of ERISA in such a way as to destroy the anti-alienation provision in the Plan. Like the Fourth Circuit in *Moore*, this court

sees "no evidence that Congress intended to invite a creditor to push a debtor into involuntary bankruptcy in order to reach his ERISA funds." *See Moore,* 907 F.2d at 1476. Nor is it appropriate that the Bank receive a windfall merely by reason of the happenstance of bankruptcy. *See Patterson,* 504 U.S. at 764, 112 S.Ct. at 2249–50; *Butner,* 440 U.S. at 55, 99 S.Ct. at 918. As such, this Court finds as a matter of fact and law, that the Debtor's interest in the Trust was part of an ERISA-qualified plan and, as such, is excluded from the Debtor's bankruptcy estate.

### Conclusion

For the reasons stated herein, the Objection to Debtor's Claim of Exemption of LaSalle National Bank Northbrook is overruled. The Bakco Data, Inc. Profit Sharing Plan and Trust is ERISA-qualified and, as such, the Debtor's interest therein is excluded from the bankruptcy estate pursuant to § 541(c)(2). Because the Debtor's interest is excluded from the estate, the court need not reach the issue of whether the Debtor's interest is exempt under § 522(b).